### TAYLOR v. WHITE.

(Court of Civil Appeals of Texas. Amarillo. April 5, 1913. Rehearing Denied May 3, 1913.)

1. MASTER AND SERVANT (§§ 206, 265*)—INJURIES TO SERVANT—BURDEN OF PROOF.

In a personal injury action by a servant engaged to run machinery, the servant has the burden of proving negligence of his employer, having assumed the risk ordinarily incident to the operation of such machines.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 550, 877–908, 955; Dec. Dig. §§ 206, 265.*]

2. MASTER AND SERVANT (§ 105*)—INJURY TO SERVANT—USAGE.

In personal injury action by a servant, where the only inference to be reasonably drawn from the evidence was that the master conformed to the usage of prudent men in well-regulated concerns in the same business, he could be declared as a matter of law to have been in the exercise of due care.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 185–191; Dec. Dig. § 105.*]

3. MASTER AND SERVANT (§ 105*)—INJURIES TO SERVANT—NEGLIGENCE OF MASTER.

A master engaged in the operation of an electric light plant is not guilty of negligence in failing to fence an exciter, a machine used for the generation of electricity, which is entirely closed except for a few openings to enable the oil to be removed and the brushes adjusted, where it appeared that no other light companies using the same machines guarded them.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 185–191; Dec. Dig. § 105.*]

4. MASTER AND SERVANT (§ 197*)—INJURIES TO SERVANT—FELLOW SERVANT.

A fireman engaged to assist plaintiff who had charge of the engines in an electric power house is plaintiff's fellow servant.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 489, 490; Dec. Dig. § 197.*]

5. MASTER AND SERVANT (§ 177*)—INJURIES TO SERVANT—FELLOW SERVANT.

A servant injured through the negligence of his fellow servant cannot recover.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 307, 352, 353; Dec. Dig. § 177.*]

6. MASTER AND SERVANT (§ 221*)—INJURIES TO SERVANT—ASSUMPTION OF RISK.

Where some eight months before the accident plaintiff requested his superior to guard the machine which caused the injury, and the superior promised to do it, but failed, and plaintiff again requested him, the last time being six or eight weeks before the accident, plaintiff assumed the risk of injury as a matter of law, it appearing that the master at that time promised he would fix it as soon as possible, for, if it was dangerous, plaintiff was not justified in using it for that length of time without guards.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 638–640, 642–648; Dec. Dig. § 221.*]

7. MASTER AND SERVANT (§§ 286, 288*)—QUESTIONS FOR JURY.

In a personal injury action by a servant, where there is any doubt as to the sufficiency of the evidence of the master's negligence or of the servant's assumption of risk, it should be submitted to the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1001, 1006, 1008, 1010–1015, 1017–1033, 1036–1042, 1044, 1046–1050, 1068–1088; Dec. Dig. §§ 286, 288.*]

Appeal from District Court, Potter County; J. N. Browning, Judge.

Action by W. W. Taylor against Frank A. White, as receiver of the Amarillo Water, Light & Power Company. From a judgment for defendant, plaintiff appeals. Affirmed.

Synnott & Fish and C. B. Reeder, all of Amarillo, for appellant. Turner & Wharton and Cooper, Merrill & Lumpkin, all of Amarillo, for appellee.

HUFF, C. J. W. W. Taylor, appellant, brought suit in the district court of Potter county against appellee, Frank A. White, as receiver of the Amarillo Water, Light & Power Company. The case was tried before a jury in the court below. The trial judge instructed a verdict for the defendant, appellee, and in obedience thereto the jury returned a verdict for appellee, and judgment was rendered in accordance therewith, from which this appeal is prosecuted. The appellant in his petition charges negligence against the appellee in failing to banister a certain exciter in the plant operated by appellee, and that appellee negligently placed a rench close to the exciter, over which ap-

pellant tripped and fell and his hand went into the exciter and was injured, for which he sues for damages. He also alleges that appellee promised to banister the exciter, and relying upon that promise he remained in the service of appellee. Appellee pleads the general issue assumed risk in its various phases and contributory negligence. "Plaintiff testified that he began working with defendant as receiver of the Amarillo Water, Light & Power Company September 1, 1909; that J. B. Scott employed him; that when he took up any matters with defendant defendant told him to go to Scott with them; that the plant where he worked had an engine room about 60 feet square, and a producer room about 30 by 40 feet; that there were three engines, four alternaters, three exciters, and two other machines in the one room, the boilers being in a separate room; that an exciter is cylindrical, and the one he got hurt on was about 30 inches long and 1 foot in diameter; that the exciter had an outside metal casing, and from the top of this to the floor it was about 2 feet; that in this casing there were 4 openings about 6 inches at one end and 18 inches at the south and where the current was generated; that inside of this casing was the commutator, a cylinder about 12 inches in diameter, and 3 feet long, extending the length of the casing; that the casing was about 2 feet in diameter with 4 slits in it 6 inches wide at one end and about 18 at the other and 16 to 18 inches long; that the commutator is smooth and brushes set in the frame rested on the cylinder, and, when the cylinder revolved, the friction between it and the brushes generated the electricity, and that the cylinder when running made 750 revolutions per minute. He further stated that this machine was located about 3½ feet from a banister on one side, the same distance from a door and 5 or 6 feet north of the engine, and that there was another engine north of this machine about 3 feet from it, and that west of the machine was a hole in the floor leading to the basement banistered on three sides, and from this to the machine in question was about 3½ feet, and that the exciter had a banister on one side but none on the other. He further said that he was employed to operate this engine, and in doing it he would pass the exciter every 10 or 15 minutes, sometimes every 5 minutes, and that part of his duties were to clean the exciter, put in new brushes, etc.; that at the time of the accident he had been on one side of the machine, cleaning it, and was walking around the machine to the other side; that something tripped him, and he fell with his breast on the frame of the machine, and his right hand fell into the machine, and it was torn.

T. H. Armstrong testified that he saw plaintiff stumble over a stilson wrench on the floor and fall into the machine. On cross-examination this witness said he him-self left the wrench there; that he was firing for plaintiff that morning, and, when he was injured, was holding the speed of the engine down while plaintiff cleaned the exciter; that witness was making gas under Mr. Scott, who was directing his work that morning; that he came in there at that time to help Taylor; that they were supposed to help each other. "I overheard Mr. Taylor speak to Mr. Scott three times that I remember distinctly about banistering up that exciter. The first time he and I were standing there, looking at the guard rail by the belt, and Mr. Scott asked how we liked it, and Mr. Taylor said it was all right, but asked if Scott did not think it would be a good idea to bring this rail around the exciter, and Mr. Scott said, 'Yes; that is so.' The second time I heard not all of the conversation. Mr. Taylor asked him if he would have it done, have the guard rail put around the exciter. I did not hear Mr. Scott's reply. The next time I remember Mr. Taylor said: 'Mr. Scott, are you going to have this guard rail put around the exciter or not?' He said: 'Yes; I will by God, as soon as I can get to it.' That is all the times I remember. The first conversation took place eight or nine months before the injury. The next time after that, about four months before the accident, the matter was mentioned again, and the last time the question came up was about six weeks or two months before the accident and injury took place."

Appellant on direct examination testified: "I had spoken three or four times to Mr. Scott about banistering up that exciter. The first time shortly after the engine was put there in June or July, 1910, I asked him if he did not think it would be a good idea to put a banister around there, that without it it was dangerous with the commutator; we had to go there every time we went to the ignition of the engine, and he said he would fix it right away. It was quite a while after that before I said much about it. I asked him about it, and he said he would fix it right away, that he was so busy before he had no time to fix it. I asked him when he would, and he said as soon as he could get to it. I last spoke to him about it in March or April, 1911, about two months or six weeks before I was injured. I asked him if he would fix that machine, and he said 'Yes,' that he would as soon as he could get to it, right away. I thought that he would do it." On cross-examination appellant testified: "I knew there was no guard rail around there. Each time I asked Mr. Scott about fixing it he said he would see about it. The last time he said he would do it right away. I do not remember my exact words in the deposition. I said this last conversation took place six weeks or two months before the accident. The second conversation prior to the last time he said he was pushed for time, but said he would fix it as soon

as he could get to it. On my direct testimony this morning I said that he promised to fix it, to fix it right away. I understood that he was going to put the banister around as soon as he had a chance to get to it."

Frank A. White, receiver for the Amarillo Water, Light & Power Company, testified as follows: "I have been in the light and water business now from the position of office boy to manager of companies since 1888. I have been employed in something like 12 plants. I have visited 200 or 300. I was employed in the Kansas City Electric Company for 16½ years, which had 10 plants in and around Kansas City. That machine required considerable attention, and at times it was necessary to visit it two or three times an hour, generally that often to oil and wipe it. It was cleaned with sandpaper on a block. There are four openings in it for the purpose of getting to the brushes to adjust and clean them; for the purpose of watching the commutator and cleaning it. There was no guard rail around that end of the commutator because it is not considered good policy to place guard rails around any dynamo, as it is necessary for the attendant to get in close to them to perform his duties, and they are protected by stationary parts so that only a small portion of the revolving parts are exposed. It is dangerous to get a man between a machine of this character and a guard rail, as he has no opportunity to get away or in case of accident or in case anything should happen to other machines he would have to climb over to get to it. You could not sand it if there were guard rails all around the machine. To put a guard rail on would keep a man from falling into the machine, but would have to be placed in such a distance from the machine that it would be impossible for a man to get to the commutator and properly clean and sand it without moving the guard rail. I have visited 200 or 300 plants in the United States. Have been in one of the largest plants in San Francisco, San Diego, El Paso, Chicago, at Niagara Falls, St. Louis, Pittsburgh, New York, and Washington. I have been all over the country, and I observed the condition of the machines and exciters in these plants, and I never saw an exciter with a guard rail around it in all the places I have visited. The railing around the belt is to protect people from getting against the belt. It does not absolutely protect a man from falling into the belt, but it lessens the danger. Very few electrical machines are guarded."

H. B. Jones, witness for appellee, testified: "My name is H. B. Jones of Amarillo, Tex., fire chief and fire marshal. I am a graduate of the engineering department of the University of Texas. I have been around electric and water and light plants. The plant in question I built and owned for a year and a half, and ran it five years. I have been through a good number of the principal plants in the United States; through most of the New York plants and Schenectady, Chicago, St. Louis, Kansas City, Los Angeles, through every plant in Los Angeles and St. Louis, and other plants I cannot recall. I helped construct the plant at Austin; that plant is about 4,000 K. W., and the one here is about 650 K. W. The Chicago plant is the biggest one I was in—about 60,000 K. W. On all direct current machines, of which the exciter is one, the commutator may come to work unevenly and very often has to be sandpapered, which is done with a block with a piece of sandpaper tacked on it. Sometimes, if you get grease on it, you take a little gasoline and clean it off, and sometimes trim the brushes. An exciter is what is called a semi-inclosed machine, with the frame extending over and leaving openings to get into the commutator. In sandpapering you have to press moderately hard—you get right over the commutator. You could not put a guard rail around an exciter that would keep you away and still be able to work on it—you have to get very close to it. I have never seen a guard rail around the commutator on any direct current machine."

J. B. Scott testified for appellee: "I live in Amarillo, and am superintendent of the Water, Light & Power Company. Have been in the electric business 11 years. I suppose I have visited a hundred plants. The Dallas light plant and Ft. Worth, Los Angeles, and Denver electric. They are larger plants than this plant at Amarillo. I have never seen a guard rail around the commutator of an exciter in any plant."

Appellant, on recall, testified: "The banister we tried to get fixed was to be at the end of that, that threw you six inches from the commutator, and would not have interfered with cleaning the machine. Had it been there, there would have been something to catch besides the machine."

[1-3] The first question in the case is: Did appellant discharge the burden resting on him to prove that appellee was guilty of negligence in the failure to place around the exciter guard rails? The appellant, having assumed the risk ordinarily incident to operating a machine of that kind, must establish that the injury was caused by the negligence of his employer. The only fact alleged is that appellee was negligent in failing to put guard rails around the exciter, and that, if the same had been done, he would have fallen on such railing, or could have caught to the same, and thereby prevented his hand from getting into the machine. His testimony is to that effect. It may be admitted that had the guard rail been so placed he would not have fallen into the machine; but it does not follow from that fact that his employer was negligent in failing to place reasonably safe instrumentalities for the work. It appears to be the rule in many courts that the legal standard

of the master's duty to furnish reasonably safe appliances or a safe place in which to do the work is that used by prudent men in well-regulated concerns. Where the only inference that can reasonably be drawn from the evidence is that the master conformed to the usage of prudent men in well-regulated concerns, engaged in his trade or business in the adoption and use of the instrumentalities, he may be declared as a matter of law to have been in the exercise of due care. Railway Co. v. Alexander, 103 Tex. 594, 132 S. W. 119; Railway Co. v. Seley, 152 U. S. 145, 14 Sup. Ct. 530, 38 L. Ed. 391; 1 Labatt on Master & Servant, §§ 44, 163; Houston Texas Ry. Co. v. Cowser, 57 Tex. 293. There is no allegation in the petition that the situation and condition of the exciter rendered it unusual or out of the ordinary with reference to its position. It is asserted, however, that the evidence shows that it was in the room with two engines—other exciters—and close to an opening leading into the basement, and that in its close proximity to the other machinery rendered it extra hazardous. The evidence does not show that the proximity of the exciter to the other machinery caused or contributed to his fall. It is not shown that the passage around the machines obstructed the way so as to prevent free and clear passage around it. The evidence is uncontroverted that the exciter is used throughout the country, and that in no plant are they guarded by rails around them for the protection of the employés. The witnesses who so testified are men of expert knowledge in the use of such machines, and, in addition, they have had large experience and observation. Their testimony further indicates that it was not proper or practicable to place guard rails around the commutator end of the machine where the injury to appellant was received, and that such railing would hinder in the proper management and care of the machine. The exciter was incased with a shield, leaving no exposure except four openings for the purpose of cleaning and adjusting the brushes in the commutator end; that is, the end where the current is generated. The jury might have said there was less danger of falling into the machine with the railing around it, but upon what fact are they authorized to say that the appellee was negligent in failing to so guard it? Would an ordinarily prudent man have followed a course other than that pursued by plants of a like kind? In following the usual practice, where lies the negligence? What special fact differentiates it from others of a like kind? Judge Williams, speaking for the court, in the Alexander Case, supra, said: "Whatever the experience of jurors may enable them to know of affairs of some kind, it is certainly not true that they can be held to know how such a business as that here in question should be conducted better

than all the employers and employés engaged in it. With only such evidence in the case, no issue is presented for a jury to pass upon." In Schroeder v. Michigan Car Co., 56 Mich. 132, 22 N. W. 220, Judge Cooley said: "From this statement of facts it will appear that, if the defendant has been guilty of any negligence contributing to the injury, it is to be found in the fact that a machine is made use of which is not so constructed as to guard as well as it might against similar accidents. Had the machine been constructed with a shield over the cogwheels, this particular accident would probably not have occurred; and any one whose attention was drawn to the danger of such accidents would probably have perceived the advisability of such a shield. But the machine is shown by the evidence to be manufactured and sold by a prominent and reputable house, and much used throughout the country, and the defendant cannot therefore be said to be exceptionally wanting in prudence in purchasing and making use of it. Such danger as would result from making use of it was perfectly apparent, and would seem to be easily avoided, and it was probably not greater than other dangers attendant upon the use of common machinery, which workmen encounter every day without hesitation and without fear. * * * But the fact of injury, and the possibility of guarding against it, do not necessarily make out a case of culpable negligence. Very few acts in life are done with such care, to prevent accident, as would have been possible; and the law only requires of any one that degree of care and prudence which persons who are reasonably careful ordinarily observe." Wilson v. Mass. Cotton Mills, 169 Mass. 67, 47 N. E. 506. We do not think the fact of the injury and that the exciter was not banistered show such negligence on the part of appellee. The jury, under the testimony, would not have been warranted in so finding. There was no error on the part of the court in refusing to submit that issue to the jury. We are not to be understood as holding that the customary negligence of the employer or any one else is a defense to the master. But we think that the opinion of expert men in handling that kind of machine, together with the fact that it is not used in any other plant with guard rails, when uncontroverted, is sufficient to exonerate the employer from the charge of negligence and as a question of law the jury could not render a verdict against the master.

[4, 5] The appellant alleges and proves he tripped and fell over a stilson wrench lying near the machine. He alleges the appellee negligently placed it there. The evidence, without contradiction, shows that one T. H. Armstrong dropped it there about 10 minutes before the accident. This witness was firing under Taylor, who was in charge of the en-

gine. Armstrong was slowing down the exciter for appellant to clean. "He would take a block with sandpaper on it and hold it down on the commutator. At the time he was moving around to the other side—had not finished cleaning it. The union I had tightened was on the No. 3 exhaust barrels." He further testified: "I came in there to help Taylor. I do not remember whether he asked me. We were supposed to help each other." This witness says he was making gas under the direction of Mr. Scott, who was the chief engineer of the plant, and was directly over himself and appellant Taylor. Under the decisions of this state, Armstrong was the fellow servant of appellant. The master is not responsible for the negligent act of a fellow servant. The testimony is undisputed that the act of dropping and leaving the wrench where appellee tripped over it was the act of a fellow servant. The jury could not, as a matter of law, have found against the appellee on the act of leaving the wrench near the exciter. Lantry-Sharpe Contracting Co. v. McCracken (Sup.) 150 S. W. 1156; Cotton Oil Co. v. Jonte, 36 Tex. Civ. App. 18, 80 S. W. 847.

[6] It is not contended but that appellant knew the condition of the exciter with reference to banistering; and, as we understand, appellant does not contend that he can recover under the law of assumed risk, unless the facts show a promise to remedy the same in that particular, and that appellant relied on such promise. It is not claimed that the appellee or the receiver promised to remedy the same, but the promise was made by Scott, the chief engineer, under whom appellant was at work. This Scott denies. The evidence of appellant shows that on several occasions Scott, in reply to questions put to him by appellant, promised he would put railing around the exciter "right away" in some of his statements, and others, "as soon as he could get to it." Scott first promised some eight months before the injury and the last time six or eight weeks before the injury. It is not clear from the appellant's testimony just which he intends to state—whether right away or as soon as he could get to it. He finally says: "I understood that he was going to put banisters around as soon as he had a chance to get to it." He further states in his testimony: "I thought that he would do it."

Armstrong, witness for appellant, testified that he heard Scott make the promise two or three times, and that he heard him say that he would do so "as soon as he could get to it." This last conversation was two months or six weeks before the injury. If appellant relied on a promise to place the banister around the machine right away, he did so for eight months from the first promise and six or eight weeks from the last

time. If his master was negligent in failing to so place the banister, appellant was equally so in continuing to work after repeated broken promises. If it was to be as soon as he could get to it, appellant assumed the risk until he did so by remaining at work. The testimony does not show that Scott could have done the work at any time before the injury occurred. We do not believe a jury under such evidence would be warranted in finding that an ordinarily prudent man, who knew of the danger, if there was such, from his master's failure to banister the exciter for so great length of time, would have taken the risk. If appellant remained after these various promises and failures under such circumstances, if his master was guilty of negligence, he would be guilty of assumed risk, which would defeat his right of recovery. Hilje v. Heath, 95 Tex. 321, 67 S. W. 91; Railway Co. v. Leash, 2 Tex. Civ. App. 68, 21 S. W. 563.

[7] We have concluded the court properly took the case from the jury and instructed the verdict. Where there is any doubt as to the sufficiency of the testimony, the court should submit the case to the jury. But, after a careful examination of all the facts in this case, we have reached the conclusion that the jury could not or should not have rendered any other verdict than that which the court instructed them to render.

The case is affirmed.